## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM BAGGETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 5:10-HC-2226-D |
| ALVIN W. KELLER, JR., Secretary, | ) | |
| Department of Correction, and | ) | |
| JOSEPH HALL, Administrator, Harnett | ) | |
| Correctional Institution, | ) | |
| | ) | |
| Respondents. | ) | |

| | | |
|---|---|---|
| JAMES POWELL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 5:10-HC-2227-D |
| ALVIN W. KELLER, JR., Secretary, | ) | |
| Department of Correction, and | ) | |
| SANDRA THOMAS, Administrator, | ) | |
| Lumberton Correctional Institution, | ) | |
| | ) | |
| Respondents. | ) | |

| | | |
|---|---|---|
| LEROY RICHARDSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 5:10-HC-2228-D |
| ALVIN W. KELLER, JR., Secretary, | ) | |
| Department of Correction, and | ) | |
| HERBERT JACKSON, Administrator, | ) | |
| Brown Creek Correctional Institution, | ) | |
| | ) | |
| Respondents. | ) | |

JOSEPH SEABORN,                          )
                                         )
                    Petitioner,          )
                                         )
          v.                             )
                                         )       No. 5:10-HC-2230-D
ALVIN W. KELLER, JR., Secretary,         )
Department of Correction, and            )
OLIVER WASHINGTON, Administrator,        )
Tillery Correctional Center,             )
                                         )
                    Respondents.         )

## ORDER

Petitioners are state inmates serving life sentences imposed between April 8, 1974, and June

30, 1978, pursuant to N.C. Gen. Stat. § 14-2 (1974).[1] Petitioners contend that they have accrued

sufficient good time, gain time, and merit time to entitle them to unconditional release and that North

Carolina's failure to release them violates the Due Process and Ex Post Facto Clauses of the United

States Constitution. The Supreme Court of North Carolina rejected their claims, and petitioners now

seek writs of habeas corpus pursuant to 28 U.S.C. § 2254 and 28 U.S.C. § 2241(c)(3). Respondents

have answered the petitions, denied that petitioners are in custody in violation of the United States

---

[1] For purposes relevant to these petitions, N.C. Gen. Stat. § 14-2 was in effect between April 8, 1974, and June 30, 1978, and provided:

> Every person who shall be convicted of any felony for which no specific punishment is prescribed by statute shall be punished by fine, by imprisonment for a term not exceeding 10 years, or by both, in the discretion of the court. A sentence of life imprisonment shall be considered as a sentence of imprisonment for a term of 80 years in the State's prison.

N.C. Gen. Stat. § 14-2 (1974).

2

Constitution, and filed motions for summary judgment.[2] Petitioners filed responses in opposition to the motions for summary judgment, and respondents filed replies.[3]

Petitioners also have filed motions to consolidate these cases, which respondents do not oppose. The parties describe these cases as "legally identical[,]" and all parties agree that consolidation of these cases promotes judicial economy. See Mots. Consolidate 1; Resps. Mots. Consolidate 1. On June 28, 2011, the clerk reassigned the Baggett, Powell, and Richardson cases to the undersigned. Accordingly, the court grants the motions to consolidate.

In resolving the pending motions for summary judgment, the court applies the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA mandates that federal courts apply a deferential standard of review when considering a state prisoner's habeas petition challenging a state court's analysis of a constitutional challenge to a state-court conviction or sentence. Congress enacted the AEDPA after carefully balancing comity, federalism, and the traditional role of the writ of habeas corpus, which serves as a safeguard against imprisonment of those held in violation of federal law. In striking this balance, the AEDPA recognizes that "[f]ederal habeas review of state convictions [or sentences] frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." Calderon v. Thompson, 523 U.S. 538, 555–56 (1998) (quotation omitted.). As explained below, when this court

---

[2] The court grants the Powell and Richardson respondents' motions to exceed page limits [Powell, D.E. 11; Richardson, D.E. 11], seeking leave to file memoranda in support of their motions for summary judgment in excess of the thirty-page limit established by Local Rule 7.2(e).

[3] On June 21, 2011, the Baggett respondents moved to deem their reply memorandum timely filed [Baggett, D.E. 24], noting that the failure to timely file their reply memorandum was "inadvertent[]" and "likely the result of confusion from multiple identical filings in multiple identical cases." [Baggett, D.E. 25] at 1 (memorandum in support of motion). The court grants the Baggett respondents' motion to deem their reply memorandum timely filed [Baggett, D.E. 24].

applies the AEDPA to the North Carolina Supreme Court's application of Jones v. Keller, 364 N.C. 249, 698 S.E.2d 49 (2010), cert. denied, 131 S. Ct. 2150 (2011), to these petitioners, the court concludes that the North Carolina Supreme Court's decision is not an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States or an unreasonable determination of the facts. Accordingly, the court grants the motions for summary judgment, dismisses the petitions for writs of habeas corpus, and denies the requests for evidentiary hearings.

I.

Before turning to the merits, the court briefly recites the crimes which produced each petitioner's conviction and sentence.

On the night of October 24, 1976, William Deems Baggett drank a pint of liquor and fought with his wife, then drove himself and several friends to "a combination poolroom and dance hall" just outside Salemburg, North Carolina. State v. Baggett, 293 N.C. 307, 308, 237 S.E.2d 827, 827–28 (1977). Baggett was carrying "a silver-colored .22 caliber pistol" and had a shotgun in his car. Id. at 308, 237 S.E.2d at 828. Upon entering the poolroom, James Dee Williams approached Baggett several times, and claimed that he knew Baggett. Id. "The fourth time Williams approached, [Baggett] struck him in the mouth." Id. Baggett then shot Williams four times with the .22 caliber pistol, "smiled, and ran from the poolroom. When outside [Baggett] went to his car, pulled out the shotgun, fired once into the air, and drove off." Id. Williams "was unarmed, did not curse or touch defendant, and offered no resistance. He died from internal hemorrhaging as a result of the gunshot wounds." Id. A jury convicted Baggett of first-degree murder, and the trial court sentenced him to life imprisonment pursuant to N.C. Gen. Stat. § 14-2 (1974). Id. at 307, 237 S.E.2d

4

at 827. The North Carolina Supreme Court affirmed Baggett's conviction and sentence. Id. at 311–12, 237 S.E.2d at 830.

Sometime between Friday, April 14, 1978, and Monday, April 17, 1978, James Alonzo Powell raped, strangled to death, and stabbed Martha Gilchrist Walker, a 69 year old woman who lived alone in Fayetteville, North Carolina. State v. Powell, 299 N.C. 95, 96–97, 261 S.E.2d 114, 116 (1980). Powell stole Walker's car and a small Sony television and on the morning of Saturday, April 15, 1978, drove the car to his cousin's home in Fayetteville, where he gave the television to another cousin. Id. A jury convicted Powell of first-degree murder, first-degree rape, and robbery with a dangerous weapon, and the trial court sentenced Powell to life imprisonment pursuant to N.C. Gen. Stat. § 14-2 (1974). Id. at 96, 261 S.E.2d at 115–16. The North Carolina Supreme Court affirmed Powell's convictions for first-degree murder and first-degree rape and life sentence, but vacated his conviction for robbery with a dangerous weapon, because "[t]he arrangement of the victim's body and the physical evidence indicate[d] she was murdered during an act of rape" and the State's evidence "indicate[d] only that defendant took the objects as an afterthought once the victim had died." Id. at 102, 261 S.E.2d at 119.

On the morning of December 13, 1974, LeRoy Richardson, along with two co-defendants, walked into a store in Robeson County, North Carolina, asked Coreene Jacobs for a pack of cigarettes, and then grabbed Jacobs and said, "I want all of your money and your life." State v. Covington, 290 N.C. 313, 319–20, 226 S.E.2d 629, 635–36 (1976). Richardson removed money from the cash register, then took a butcher knife and stabbed Jacobs in the neck. Id. Richardson also stabbed Joseph Maxwell Cook, a customer. Id. Cook died as a result of the attack. Id. A jury convicted Richardson of first-degree murder, and the trial court sentenced him to death. Id. at 347–48, 226 S.E.2d at 652. The North Carolina Supreme Court affirmed Richardson's conviction,

5

but, in light of <u>Woodson v. North Carolina</u>, 428 U.S. 280 (1976), reduced the sentence to life imprisonment pursuant to N.C. Gen. Stat. § 14-2 (1974). <u>Covington</u>, 290 N.C. at 347–48, 226 S.E.2d at 652.

On September 2, 1975, Seaborn, armed with a sawed-off shotgun and with the assistance of two co-defendants, robbed a bank in Jamesville, North Carolina. <u>State v. Squire</u>, 292 N.C. 494, 496–99, 234 S.E.2d 563, 564–66 (1977). The three fled the scene in a car Seaborn had borrowed that morning. <u>Id.</u> A state highway patrolman (Trooper Davis) stopped the car, and, as he approached the car, Seaborn (who was lying down in the back seat) arose and shot Trooper Davis in the throat, killing him. <u>Id.</u> A jury convicted Seaborn of first-degree felony murder, and the trial court sentenced him to death. <u>Id.</u> at 500–02, 234 S.E.2d at 567. The North Carolina Supreme Court affirmed Seaborn's conviction, but, in light of <u>Woodson v. North Carolina</u>, 428 U.S. 280 (1976), reduced the sentence to life imprisonment pursuant to N.C. Gen. Stat. § 14-2 (1974). <u>Squire</u>, 292 N.C. at 513, 234 S.E.2d at 574.

Petitioners argue that since their periods of incarceration began, the North Carolina Department of Correction ("DOC") has awarded them certain good time, gain time, and merit time thereby entitling them to unconditional release. <u>See</u> Baggett Pet. ¶ 108; Powell Pet. ¶ 102; Richardson Pet. ¶ 108; Seaborn Pet. ¶ 108. Petitioners also contend that DOC's failure to release them violates their rights under the Due Process and Ex Post Facto Clauses of the United States Constitution. Respondents disagree with petitioners' interpretation of the facts, North Carolina law, and the United States Constitution.

In order to understand these petitions, the court begins with Bobby Bowden, another state inmate sentenced to life imprisonment under N.C. Gen. Stat. § 14-2 (1974). On December 12, 2005, Bowden filed a state habeas petition challenging DOC's refusal to apply sentence reduction credits

6

towards an immediate release date. State v. Bowden, 193 N.C. App. 597, 598, 668 S.E.2d 107, 108 (2008). Bowden, like petitioners, is serving a sentence of life imprisonment under N.C. Gen. Stat. § 14-2 (1974). In Bowden's state habeas petition, Bowden argued that as a matter of state law his sentence of life imprisonment really was an 80-year sentence. Moreover, he argued that, after applying all sentence reduction credits, he had completed his 80-year sentence and was entitled to immediate release. The state trial court held that N.C. Gen. Stat. § 14-2 (1974) requires DOC to treat Bowden's life sentence as a term of 80 years only for purposes of parole eligibility. Bowden appealed. On November 4, 2008, the North Carolina Court of Appeals held that a life sentence under N.C. Gen. Stat. § 14-2 "is considered as an 80-year sentence for all purposes" under North Carolina law and remanded Bowden's petition to the state trial court "for a hearing to determine how many sentence reduction credits [Bowden] is eligible to receive and how those credits are to be applied." Id. at 601, 668 S.E.2d at 110. On September 9, 2009, the North Carolina Supreme Court heard oral argument in the case. State v. Bowden, 363 N.C. 621, 683 S.E.2d 208 (2009). On October 9, 2009, the Supreme Court determined that it had improvidently allowed discretionary review, and declined to review the ruling of the Court of Appeals. Id. at 621, 683 S.E.2d at 208.

Until Bowden, DOC had "interpreted a life sentence imposed under [N.C. Gen. Stat. § 14-2 (1974)] to be an indeterminate sentence that would expire only upon an inmate's death." Jones, 364 N.C. at 252, 698 S.E.2d at 53. DOC is the "arm of the executive branch of government . . . . authorized [by statute] to exercise regulatory power over the administration of prison sentences." Id. at 253, 698 S.E.2d at 53. Thus, DOC has issued "regulations [which] provide for good time, gain time, and merit time to be credited against an inmate's sentence." Id. at 254, 698 S.E.2d at 54. DOC refers to these credits collectively as "sentence reduction credits" and defines them as "credits applied to an inmate's sentence that reduces the amount of time to be served." N.C. Dep't of Corr.,

7

Div. of Prisons, Policy and Procedure, ch. B, § .0110(f) (Oct. 5, 2007); see Jones, 364 N.C. at 258, 698 S.E.2d at 56.[4] Accordingly, while DOC had awarded petitioners sentence reduction credits throughout their incarceration, it had "awarded [each petitioner] good time solely for the purposes of allowing him to move to the least restrictive custody grade and to calculate his parole eligibility date, and not for the purpose of allowing [any petitioner] unconditional release." Jones, 364 N.C. at 254, 698 S.E.2d at 54. At all times relevant to this dispute, DOC's longstanding practice with regard to sentence reduction credits for inmates serving a sentence of life imprisonment under N.C. Gen. Stat. § 14-2 (1974) was not contained in "any written statute, regulation, policy, or court opinion." Seaborn Pet. ¶ 30; see Jones, 364 N.C. at 270–71, 698 S.E.2d at 64 (Timmons-Goodson, J., dissenting).

As a result of the legal uncertainty that Bowden created, DOC examined the sentences of all inmates sentenced to life imprisonment under N.C. Gen. Stat. § 14-2 (1974), including petitioners. See Baggett Pet. ¶¶ 10–13; Powell Pet. ¶¶ 9–13; Richardson Pet. ¶¶ 10–14; Seaborn Pet. ¶¶ 10–14. DOC conducted this examination between October 9 and 22, 2009, and did so primarily via internal e-mails and memorandums. Baggett Pet. ¶¶ 10–12, 16; Powell Pet. ¶¶ 9–11, 13, 16–17; Richardson Pet. ¶¶ 10–13, 16–17; Seaborn Pet. ¶¶ 10–13, 16–17. On October 16 and 24, 2009, DOC published

---

[4] On May 31, 2011, DOC promulgated new policies and procedures. Section .0110(a) now reads as follows:

Sentence Credits – Time credits applied to the court-ordered term-of-years sentence of any inmate for the purpose of reducing the amount of time to be served. These credits are called Good Time, Gain Time, Earned Time and Meritorious Time.

N.C. Dep't of Corr., Div. of Prisons, Policy and Procedure, ch. B, § .0110(a) (May 31, 2011). The revised polices and procedures explicitly exempt "[a]ny inmate serving a life sentence" from receiving sentence credits. Compare id., §§ .0111(d)(8), .0112(c)(8), .0113(f)(8), .0114(a) with N.C. Dep't of Corr., Div. of Prisons, Policy and Procedure, ch. B, §§ .0111(d), .0112(c), .0113(f), .0114(a) (Oct. 5, 2007).

8

lists of inmates sentenced under N.C. Gen. Stat. § 14-2 (1974) who would be eligible for release with application of sentence reduction credits to an 80-year term of imprisonment. Baggett Pet. ¶ 13 & n.3; Powell Pet. ¶ 12 & n.3; Richardson Pet. ¶ 14 & n.3; Seaborn Pet. ¶ 14 & n.4. Baggett was included on the list published on October 16, 2009, and Richardson and Seaborn were included on the list published on October 24, 2009. See Baggett Pet., Ex. 11; N.C. Dep't of Corr., News Releases, http://www.doc.state.nc.us/NEWS/2009/Releases/Additional%20names%20added %20to%20list%20of%20affected%20inmates.htm (last visited June 30, 2011). Powell's projected release date was October 10, 2010. Powell Pet. ¶ 9 & Ex. 7 (email from DOC Public Affairs Director to Governor's office). Between October 12 and 22, 2009, Baggett, Richardson, and Seaborn were summoned to prison officials' offices and told to prepare for their release on October 29, 2009. Baggett Pet. ¶ 14; Richardson Pet. ¶ 15; Seaborn Pet. ¶ 15. DOC Secretary Alvin Keller, however, never ordered the release of petitioners or any other Bowden-class inmates. Rather, respondents describe this process as "an administrative track to deal with practical considerations if a worst case scenario occurred requiring unconditional release of Bowden class inmates." Mems. Supp. Mots. Summ. J. 6 (citing Tr. Keller's Test. at 61).

The Bowden decision and the specter of immediately releasing numerous inmates convicted of first-degree murder and serving sentences of life imprisonment caused a great public outcry. The issue received the personal attention of Governor Beverly Perdue and Secretary Keller. On October 22, 2009, an internal DOC email instructed prison administrators to read a press release from Governor Perdue to Bowden-class inmates, announcing that the inmates would not be released pending further litigation. See Baggett Pet. ¶ 19 & Ex. 15; Powell Pet. ¶ 15 & Ex. 15; Richardson Pet. ¶ 19 & Ex. 19; Seaborn Pet. ¶ 19 & Ex. 17. On the same date, a prison administrator read Seaborn a memo from Secretary Keller indicating that he was not going to be released. Seaborn Pet.

¶ 20. Instead, pursuant to a directive from Secretary Keller, DOC calculated all petitioners' unconditional release dates as "80 years minus applicable jail credit earned while the prisoner awaited conviction and sentencing." Baggett Pet. ¶ 24 & Ex. 19 (Nov. 19, 2009 press release); Powell Pet. ¶ 18 & Ex. 19 (same); Richardson Pet. ¶ 24 & Ex. 22 (same); Seaborn Pet. ¶ 24 & Ex. 20 (same). Petitioners' projected unconditional release dates are now between November 25, 2054, and December 14, 2058. Baggett Pet. ¶ 22; Powell Pet. ¶ 17; Richardson Pet. ¶ 22; Seaborn Pet. ¶ 23.[5]

On November 18, 2009, Alford Jones, another inmate sentenced to life imprisonment under N.C. Gen. Stat. § 14-2 (1974), challenged DOC's determination that his accrued sentence reduction credits did not entitle him to immediate release. Jones, 364 N.C. at 251, 698 S.E.2d at 52. The state trial court construed Bowden and concluded that Jones was entitled to be awarded good time, gain time, and merit time for all purposes, including calculation of his date of unconditional release. The state trial court then determined that Jones's good time, gain time, and merit time entitled Jones to immediate release. Accordingly, the state trial court allowed Jones's petition for habeas corpus and ordered that Jones be released. The Supreme Court of North Carolina immediately allowed DOC's motion for temporary stay and granted its petition for writ of certiorari. Id.

On August 27, 2010, the North Carolina Supreme Court issued its decision in Jones. Justice Edmunds wrote a plurality opinion, in which Chief Justice Parker and Justice Martin joined. Justice Newby and Justice Brady concurred in the result. The plurality noted that DOC is authorized by state statutes to "propose rules and regulations for the government of the State prison system, . . . .

---

[5] Bowden also remains incarcerated, with a projected release date of July 23, 2055. See N.C. Dep't of Corr., Offender Pub. Info., http://webapps6.doc.state.nc.us/opi/viewoffender.do?method= view&offenderID=0038875 (last visited June 30, 2011).

have control and custody of all prisoners serving sentence in the State prison system, and . . . . [make] provisions relating to grades of prisoners, rewards and privileges applicable to the several classifications of prisoners as an inducement to good conduct, [and] allowances of time for good behavior . . . ." Id. at 252–53, 698 S.E.2d at 53 (quotations omitted) (citing N.C. Gen. Stat. §§ 148-4, -11, -13 (1974)). The plurality "first consider[ed] whether DOC's administration of good time, gain time, and merit time credits is within the statutory authority delegated it by the General Assembly," concluded that it was within such authority, and found that "implicit in DOC's power to allow time for good behavior under section 148-13 is authority to determine the purposes for which that time is allowed." Id. at 255–56, 698 S.E.2d at 54–55.

The plurality then "turn[ed] to the question whether DOC's interpretation and implementation of its regulations are constitutional," and addressed Jones's contentions that "DOC has violated his rights to due process and to equal protection" and committed "an ex post facto violation." Id. at 256, 698 S.E.2d at 55. The plurality rejected each of Jones's contentions, and found that Jones was "not . . . denied credits in which he has a constitutionally protected liberty interest," that "DOC has a rational basis for denying [Jones] good time, gain time, and merit time for the purposes of unconditional release," and that Jones suffered no ex post facto violation in the absence of any "legislation or regulation [which] has altered the award of sentence reduction credits" or a "change[] [by DOC in] its interpretation of its applicable regulations." Id. at 257, 259–60, 698 S.E.2d at 56–58. Justice Newby and Justice Brady concurred in the result. Justice Newby agreed that Jones was lawfully incarcerated, that DOC acted in accordance with its statutory grant of authority, and that Jones "does not have any due process liberty interest in having his good time, gain time, or merit time credits applied to his sentence for purposes of calculating an unconditional release date." Id. at 260–61, 698 S.E.2d at 58 (Newby, J., concurring).

11

Justice Timmons-Goodson and Justice Hudson dissented and concluded that Jones received sentence-reduction credit under state law and that DOC could not retroactively withhold such credit. Accordingly, the dissent would have granted the writ and ordered Jones's immediate release. Id. at 263–71, 698 S.E.2d at 60–64 (Timmons-Goodson, J., dissenting).

Baggett, Richardson, and Seaborn filed grievances seeking immediate release, which DOC denied. Baggett Pet. ¶ 29 & Ex. 22; Richardson Pet. ¶ 29 & Ex. 25; Seaborn Pet. ¶ 29 & Ex. 23. On October 21 and 22, 2010, petitioners filed these petitions and state habeas petitions. See Mems. Supp. Mots. Summ. J., Ex. 7. On November 4, 2010, the North Carolina Supreme Court unanimously and summarily denied the petitioners' state habeas petitions. See Baggett v. Keller, 703 S.E.2d 155 (N.C. 2010); Powell v. Keller, 703 S.E.2d 450 (N.C. 2010); Richardson v. Keller, 703 S.E.2d 451 (N.C. 2010); Seaborn v. Keller, 703 S.E.2d 451 (N.C. 2010). In doing so, the North Carolina Supreme Court did not issue an opinion, but obviously relied on Jones because the legal analysis applicable to Jones applies equally to petitioners. Cf. Harrington v. Richter, 131 S. Ct. 770, 784–85 (2011) (AEDPA does not require a state court to issue an opinion explaining its reasoning; when a state court has denied relief on a federal claim, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary").

## II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has

12

met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

A federal court cannot grant habeas relief in cases where a state court considered a claim on its merits unless (1) the state-court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or (2) the state-court decision was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d). A state-court decision is "contrary to" Supreme Court precedent if it either "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to the Supreme Court's. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state-court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see Renico v. Lett, 130 S. Ct. 1855, 1862 (2010).

> [Section 2254(d)] does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one, nor does it require a federal habeas court to offer an independent opinion as to whether it believes, based upon its own reading of the controlling

> Supreme Court precedents, that the [petitioner's] constitutional rights were violated during the state court proceedings.

Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000) (en banc). Moreover, a state court's factual determination is presumed correct, unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010).

> Of particular importance to these cases, section 2254(d)

> preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington, 131 S. Ct. at 786–87; DeCastro v. Branker, No. 10-5, 2011 WL 2164115, at *5 (4th Cir. June 3, 2011). Congress intended that this standard under the AEDPA would be difficult to meet. See Harrington, 131 S. Ct. at 784. "Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787. Stated succinctly, in order to prevail, petitioners must show "there was no reasonable basis for the state court to deny relief." Id. at 784.

A.

Respondents first contend that the petitions are untimely. See Mems. Supp. Mots. Summ. J. 9–15. Under the AEDPA, a person in custody pursuant to the judgment of a state court must file any petition for a writ of habeas corpus within one year. See 28 U.S.C. § 2244(d)(1). If a prisoner's conviction became final before the AEDPA's effective date, the one-year statute of limitations runs from April 24, 1996, which is the AEDPA's effective date, or the date on which the factual predicate

14

of the claim could have been discovered through the exercise of due diligence. Brown v. Angelone, 150 F.3d 370, 375 (4th Cir. 1998); see 28 U.S.C. § 2244(d)(1)(D). The limitation period under section 2244(d)(1) is tolled during the time "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2); Taylor v. Lee, 186 F.3d 557, 560 & n.2 (4th Cir. 1999). An application for post-conviction or other collateral review is "pending" from initial filing in the state courts until final disposition in the state courts. Taylor, 186 F.3d at 561. The statutory period then resumes after the state court of appeals denies a petitioner's certiorari petition, see Hernandez v. Caldwell, 225 F.3d 435, 438 (4th Cir. 2000), or after the petitioner "unreasonably delays in filing [a certiorari] petition." N.C. R. App. P. 21(e); McConnell v. Beck, 427 F. Supp. 2d 578, 582 (M.D.N.C. 2006); see Evans v. Chavis, 546 U.S. 189, 201 (2006) (interpreting a similar provision of California law).

Here, petitioners' convictions became final no later than 90 days after the North Carolina Supreme Court affirmed their convictions, between 1976 and 1980. See, e.g., Clay v. United States, 537 U.S. 522, 527 (2003). Thus, according to respondents, petitioners' one-year periods of limitations began to run on April 24, 1996, and expired one year later on April 24, 1997. Mems. Supp. Mot. Summ. J. 9–10; see Hernandez, 225 F.3d at 438–39; cf. Wade v. Robinson, 327 F.3d 328, 333 (4th Cir. 2003) (holding that 28 U.S.C. § 2241(d)(1) applies to petitions challenging administrative agency decisions, such as parole revocation). Petitioners disagree and contend that their "cause of action accrued on October 29, 2009, the date on which the [DOC] failed to release [each petitioner] despite . . . having informed him that he would be released on that date."[6] Mems.

---

[6] Powell joins in this contention, although his initial projected release date was October 10, 2010, rather than October 29, 2009. See, Powell Pet. ¶ 9 & Ex. 7. Thus, Powell contends that his cause of action accrued on October 10, 2010, eleven days before he filed his federal habeas petition.

Opp'n Mots. Summ. J. 18 (citing 28 U.S.C. § 2244(d)(1)(D)). Thus, because petitioners filed their petitions between October 21 and 22, 2010, they contend their petitions are timely. Id.; cf. Hawkins v. Freeman, 195 F.3d 732, 737 (4th Cir. 1999) (en banc).

Courts have reached different conclusions regarding the accrual and timeliness of post-AEDPA claims for release by state inmates. Compare Wade, 327 F.3d at 333 (calculating the statute of limitation from the date on which petitioner "could have discovered [the factual predicate for his claim] through public sources"); Sena v. N.M. Corr. Dep't, 66 F. App'x 174, 175–77 (10th Cir. 2003) (unpublished) (rejecting petitioner's contention that his due process claim did not accrue until he earned enough sentencing credits to be eligible for release because petitioner became aware of the alleged violation when the sentencing order was entered); Smith v. Johnson, No. 7:08cv00514, 2008 WL 4960436, at *2 (W.D. Va. Nov. 19, 2008) (unpublished) (dismissing state inmate's petition as untimely because the inmate "could have discovered his ineligibility for early release with due diligence when his period of incarceration began ten years ago"); with Evans v. Sec'y Pa. Dep't of Corr., No. 09-2657, 2011 WL 1833237, at *5 (3d Cir. May 16, 2011) (finding that a state inmate had not procedurally defaulted his claim because the facts giving rise to his due process claim were unknown to him until eleven years after he was sentenced); Murphy v. Espinoza, 401 F. Supp. 2d 1048, 1053 (C.D. Cal. 2005) (finding that the time period for filing § 2254 petition began to run from the date on which the state parole board's continued confinement of the petitioner violated the plea agreement); Wheat v. Dretke, No. 3-05CV1315H, 2005 WL 1667832, at *1 n.1 (N.D. Tex. July 15, 2005) (unpublished) (questioning the timeliness of § 2254 petition where state prisoner had known he would not be released for over three years, but dismissing petition on the merits), report and recommendation adopted, 2005 WL 1837154 (N.D. Tex. Aug. 3, 2005) (unpublished).

This court need not resolve the dispute about the timeliness of the petitions because timeliness is not a jurisdictional prerequisite under the AEDPA. See Holland v. Florida, 130 S. Ct. 2549, 2560 (2010); Day v. McDonough, 547 U.S. 198, 205 (2006); Simms v. Acevedo, 595 F.3d 774, 779 (7th Cir. 2010); Diaz v. Kelly, 515 F.3d 149, 153 (2d Cir. 2008); Trussell v. Bowersox, 447 F.3d 588, 590 (8th Cir. 2006). Instead, the court assumes, without deciding, that the petitions were timely and proceeds to the merits. See, e.g., Trussell, 477 F.3d at 590.

## B.

Petitioners' terms of imprisonment are governed by N.C. Gen. Stat. § 14-2 (1974), which provides that such a sentence was to "be considered as a sentence of imprisonment for a term of 80 years in the State's prison." N.C. Gen. Stat. § 14-2 (1974); see Bowden, 193 N.C. App. at 599, 668 S.E.2d at 109. Until the North Carolina Court of Appeals interpreted section 14-2 in Bowden as constituting an 80-year sentence of imprisonment, DOC had never treated petitioners' sentences as expiring 80 years from their imposition. Although the court's holding in Bowden clarified that DOC was required to "define[] the term of life imprisonment" for each petitioner as 80 years, the court expressly left open the question of "how [sentence reduction] credits are to be applied" to such a sentence. Bowden, 193 N.C. App. at 601, 668 S.E.2d at 110.

Petitioners contend that DOC made a decision to apply the sentence reduction credits towards their unconditional releases and then reversed its decision, thereby violating the Due Process Clause and the Ex Post Facto Clause. See Mems. Opp'n Mots. Summ. J. 5–18. DOC disagrees and argues that under AEDPA's deferential standard of review, the North Carolina Supreme Court's decision in Jones was not an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States or an unreasonable determination of the facts. Thus, DOC urges the court to deny the petitions.

As for petitioners' contention that DOC's actions violated due process, the North Carolina Supreme Court plurality opinion in Jones rejected this claim and stated:

> The United States Supreme Court has held that "[l]iberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." Hewitt v. Helms, 459 U.S. 460, 466 (1983), abrogated in part on other grounds by Sandin v. Conner, 515 U.S. 472 (1995). However, "due process is flexible and calls for such procedural protections as the particular situation demands . . . . [N]ot all situations calling for procedural safeguards call for the same kind of procedure." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). While a prisoner retains basic constitutional rights, State v. Primes, 314 N.C. 202, 208, 333 S.E.2d 278, 281 (1985), the Supreme Court has found that an inmate's liberty interests derived from the Fourteenth Amendment are limited, given the nature of incarceration, Helms, 459 U.S. at 467 ("[O]ur decisions have consistently refused to recognize more than the most basic liberty interests in prisoners."). Nevertheless, "a State may create a liberty interest protected by the Due Process Clause through its enactment of certain statutory or regulatory measures." Id. at 469; see also Sandin v. Conner, 515 U.S. at 483–84. Prisoner benefits in the form of good time, gain time, and merit time arise from such statutes or regulations. See Wolff v. McDonnell, 418 U.S. 539, 557 (1974) (stating that "the Constitution itself does not guarantee good time credit for satisfactory behavior while in prison . . . [b]ut the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances").

> The liberty interest alleged to be at issue here thus is one created by the State through its regulations. When a liberty interest is created by a State, it follows that the State can, within reasonable and constitutional limits, control the contours of the liberty interest it creates. In other words, the liberty interest created by the State through its regulations may be limited to those particular aspects of an inmate's incarceration that fall within the purview of those regulations. DOC has interpreted its regulations as permitting the award of different types of time credits for certain purposes and has, in fact, awarded those credits to Jones for those purposes. On the record before this Court, DOC has taken no action against Jones for punitive reasons. **Because Jones has received the awards to which he is entitled for the purposes for which he is entitled, he has not been denied credits in which he has a constitutionally protected liberty interest.**

> Petitioner contends, however, that his credits should be applied toward calculation of the date of his unconditional release. We disagree. As indicated by Wolff, Helms, and Sandin, Jones's liberty interest in good time, gain time, and merit time is limited. Thus, his liberty interest, **if any**, in having these credits used for the purpose of calculating his date of unconditional release is de minimis, particularly

18

when contrasted with the State's compelling interest in keeping inmates incarcerated until they can be released with safety to themselves and to the public. The record indicates that Jones is eligible for parole and has received annual parole reviews, but that the Parole Commission consistently has declined to parole him. Accordingly, Jones has received the process that is due him as an inmate eligible for parole, when the State's corresponding interest is assuring that inmates are safely released under supervision. Assuming without deciding that DOC's procedures for determining parole adequately protect an inmate's due process rights to consideration for parole, those procedures are also adequate to preserve Jones's constitutional rights while still permitting the State to withhold application of Jones's good time, gain time, and merit time to the calculation of a date for his unconditional release. **He has no State-created right to have his time credits used to calculate his eligibility for unconditional release. Jones's due process rights have not been violated.**

This State interest in ensuring public safety is particularly pronounced when dealing with those convicted of first-degree murder. See State v. Rorie, 348 N.C. 266, 271, 500 S.E.2d 77, 80 (1998) (describing first-degree murder as "this most serious crime"), superseded by statute, Act of May 8, 2001, ch. 81, secs. 1, 3, 2001 N.C. Sess. Laws 163, 163–65, on other grounds as recognized in State v. Defoe, 364 N.C. 29, 691 S.E.2d 1 (2010); see also Graham v. Florida, 130 S. Ct. 2011 (2010) (stating that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers"); State v. Davis, 290 N.C. 511, 548, 227 S.E.2d 97, 119–20 (1976) ("Murder in the first degree is obviously the most serious of the felonious homicides."). The State has a duty to seek to ensure public safety through the orderly release of prisoners who are both under adequate supervision and prepared for resuming life outside of confinement. See N.C.G.S. § 15A-1371(d) (2009) (setting forth conditions under which the Post-Release Supervision and Parole Commission may refuse to release a prisoner on parole). DOC's determination that Jones's immediate unconditional release would endanger public safety in any respect is a compelling State interest outweighing any limited due process liberty interest Jones may have in application of his good time, gain time, and merit time credits to his unconditional release.

In addressing Jones's contentions, we are aware that DOC's regulations currently define good time, gain time, and merit time as "[t]ime credits applied to an inmate's sentence that reduce[ ] the amount of time to be served" and state that "[g]ood time is sentence reduction credit awarded, at the rate of one day deducted for each day served in custody for good behavior and/or without an infraction of inmate conduct rules." DOC Manual ch. B, § .0110(a), (f) (Oct. 5, 2007). These regulations were promulgated by DOC years after Jones was sentenced, see 5 NCAC 2B.0110(6) (Apr. 1995); id. 2B.0102 (Sept. 1983), when no challenge had been raised to the State's position that those sentenced to life pursuant to the version of section 14-2 in effect between 8 April 1974 and 30 June 1978 had been given an indeterminate sentence. Except for this limited time period, life sentences unquestionably were and still are

19

indeterminate sentences. **No regulation explicitly provides that credits are to be used to calculate an unconditional release date, and DOC asserts that it never considered that these regulations applied to Jones or other inmates similarly situated for the purpose of calculating an unconditional release date. Because the regulations were understood to be inapplicable for that purpose, the State did not fully prepare Jones for unconditional release.** In light of the compelling State interest in maintaining public safety, we conclude that these regulations do not require that DOC apply time credits for purposes of unconditional release to those who committed first-degree murder during the 8 April 1974 through 30 June 1978 time frame and were sentenced to life imprisonment.

Jones, 364 N.C. at 256–58, 698 S.E.2d at 55–57 (alterations in original) (emphasis added). Justice

Newby and Justice Brady agreed that the relevant North Carolina statutes and regulations do not give

inmates sentenced to life imprisonment under N.C. Gen. Stat. § 14-2 (1974) for first-degree murder

during the relevant time period a "liberty interest in having time credits applied to calculate their

unconditional release dates." Id. at 262, 698 S.E.2d at 59 (Newby, J., concurring).

Petitioners seize upon the plurality's use of the phrase "de minimis" to describe his liberty

interest in his sentence reduction credits. See Mems. Opp'n Mots. Summ. J. 9–13. Petitioners then

argue that the North Carolina Supreme Court failed properly to apply Wolff and hold that "[t]he

State may rescind such credits only for the reasons specified in its existing regulations." Id. at 12.

Petitioners misunderstand both Jones and the AEDPA's deferential standard of review. The

issue is not whether the North Carolina Supreme Court in Jones failed to properly apply Wolff. See,

e.g., Harrington, 131 S. Ct. at 786–87; Premo v. Moore, 131 S. Ct. 733, 739–40 (2011); Renico, 130

S. Ct. at 1862; Williams, 529 U.S. at 405. Rather, in reviewing Jones, the issue is whether the North

Carolina Supreme Court's application of Wolff "was so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement." Harrington, 131 S. Ct. at 786–87. With the appropriate standard in mind, the court

turns to Wolff.

In Wolff, the Supreme Court addressed whether Nebraska's prison disciplinary proceedings complied with the Due Process Clause of the Fourteenth Amendment. See Wolff v. McDonnell, 418 U.S. 539, 542–43 (1974). Nebraska inmates challenged the decision of Nebraska prison officials to revoke good time credits without adequate procedures. Id. at 553. Under Nebraska's statutory scheme, the parties agreed that inmates earned good time credit under a state statute that mandated sentence reductions for good behavior, revocable only for flagrant or serious misconduct. Id. at 545 n.5, 546, n.6. The Court focused on whether Nebraska's rules, practices, and procedures "which might result in the taking of good time violated the Due Process Clause of the Fourteenth Amendment." Id. at 553. As part of its analysis, the Court noted:

> It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior . . . . But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

Id. at 557. Thus, Wolff teaches that the Due Process Clause does not create a right to good-time credit. Id. Rather, the source of such a right must be state law. Id.

The North Carolina Supreme Court's five-Justice majority in Jones found as a fact that DOC "has never used good time, gain time, or merit time credits in the calculation of unconditional release dates for inmates [such as petitioners] who received sentences of life imprisonment." Jones, 364 N.C. at 254, 698 S.E.2d at 54; id. at 262, 698 S.E.2d at 59 (Newby, J., concurring). Rather, DOC used such credits "solely for the purposes of allowing [a prisoner serving such a life sentence] to move to the least restrictive custody grade and to calculate his parole eligibility date, and not for the

21

purpose of allowing . . . unconditional release." Jones, 364 N.C. at 254, 698 S.E.2d at 54; see id. at 263, 698 S.E.2d at 59 (Newby, J., concurring). These findings are presumed correct, unless rebutted by clear and convincing evidence, and petitioners have failed to rebut these findings. See 28 U.S.C. § 2254(3)(1); Sharpe, 593 F.3d at 378. Furthermore, the North Carolina Supreme Court held in Jones, as a matter of North Carolina law, that DOC's interpretation of the governing statutory and regulatory scheme was within its statutory authority. Jones, 364 N.C. at 255–56, 698 S.E.2d at 54–55; id. at 261–62, 698 S.E.2d at 59 (Newby, J., concurring). In sum, the North Carolina Supreme Court held that Jones had "received the [credits] to which he is entitled" under North Carolina law and that North Carolina law did not mandate applying such credits "toward calculation of the date of his unconditional release." Jones, 364 N.C. at 257, 698 S.E.2d at 56; id. at 262, 698 S.E.2d at 59 (Newby, J., concurring).

To state the obvious, Nebraska's statutory and regulatory scheme in Wolff is factually and legally distinguishable from North Carolina's statutory and regulatory scheme. Notably, unlike the Nebraska statute in Wolff, petitioners cite no North Carolina statute which required DOC to apply sentence reduction credits to calculate their dates of unconditional release. As for the DOC regulations that the Supreme Court of North Carolina cited and discussed in Jones, the DOC promulgated those regulations long after petitioners were sentenced to life imprisonment and the Supreme Court of North Carolina found as a fact that the DOC had never interpreted those regulations to apply to petitioners for the purpose of calculating an unconditional release date. Furthermore, after the North Carolina Court of Appeals' Bowden decision created legal uncertainty, the DOC determined that it was not required by law or regulation to change the way in which it awarded sentence reduction credits to petitioners (i.e., for parole eligibility and custodial classification, but not for immediate release). Thus, unlike Wolff, DOC did not revoke petitioners'

22

sentence reduction credits. See Jones, 364 N.C. at 257–60, 698 S.E.2d at 56–58; id. at 260–63, 698 S.E.2d at 58–60 (Newby, J., concurring). This conclusion makes sense because, under North Carolina law (as interpreted by the North Carolina Supreme Court), petitioners had never earned or been entitled to such sentence reduction credit for purposes of calculating immediate release. Accordingly, the North Carolina Supreme Court's decision in Jones was not an unreasonable application of clearly established federal law as determined in Wolff or any other precedent of the Supreme Court of the United States. Cf. Jones, 364 N.C. at 256–58, 698 S.E.2d at 55–57 (analyzing Wolff and Hewitt v. Helms, 459 U.S. 460 (1983), abrogated in part on other grounds by Sandin v. Conner, 515 U.S. 472 (1995)).

Petitioners also can find no comfort in their attack on the period in October 2009, when DOC internally examined whether the North Carolina Court of Appeals' Bowden decision required DOC to change the way it awarded sentence reduction credits, told Baggett, Richardson, and Seaborn to prepare for their release, published Baggett, Richardson, and Seaborn's names on lists, and Secretary Keller ultimately determined that DOC was not required to release them. Simply put, DOC's actions in October 2009 did not give rise to a liberty interest sufficient to invoke due process protections. At most, during the October 2009 review period, DOC made an error of state law in construing Bowden. The Supreme Court of the United States, however, has "long recognized that a mere error of state law is not a denial of due process." Swarthout v. Cooke, 131 S. Ct. 859, 863 (2011) (per curiam) (quotations omitted); Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); Engle v. Isaac, 456 U.S. 107, 121 n.21 (1982); see Evans, 2011 WL 1833237, at *10–11 ("[T]here is . . . no protected liberty interest in the expectation of release on an erroneously calculated release date"); Gonzalez-Fuentes v. Molina, 607 F.3d 864, 880–94 (1st Cir. 2010) (finding no violation of due process in re-incarceration of prisoners when their supervised release program was eliminated by a

23

new regulation); Hawkins, 195 F.3d at 738–50 (finding no violation of due process in re-incarceration of an erroneously paroled North Carolina prisoner). Furthermore, to the extent that DOC erred in construing North Carolina law at some point following Bowden, the North Carolina Supreme Court's August 2010 decision in Jones clarified North Carolina law. Moreover, insofar as petitioners ask this court to determine whether the Supreme Court of North Carolina erred in construing state law in Jones, such a request is beyond the scope of federal habeas review. See, e.g., Estelle, 502 U.S. at 67–68; Sharpe, 593 F. 3d at 383; Spencer v. Murray, 5 F.3d 758, 762 (4th Cir. 1993); Bryant v. Maryland, 848 F.2d 492, 493 (4th Cir. 1988). Finally, the plurality's statement in Jones, that the "liberty interest, **if any**, in having these credits used for the purpose of calculating [the prisoner's] unconditional release is **de minimis**,"[7] fails to undermine the clear holding of the five-Justice majority that North Carolina law created no such liberty interest. Thus, under the AEDPA's deferential standard of review, petitioners' due process claim fails. See, e.g., Harrington, 131 S. Ct. at 786–87; DeCastro, 2011 WL 2164115, at *5.

As for petitioners' contention that DOC's actions violated the Ex Post Facto Clause, the North Carolina Supreme Court rejected this claim and stated:

> The constitutions of both the United States and North Carolina prohibit the enactment of ex post facto laws. U.S. Const. art. I, § 10, cl. 1 ("No state shall . . . pass any . . . ex post facto law . . . ."); N.C. Const. art. I, § 16 ("Retrospective laws, punishing acts committed before the existence of such laws and by them only declared criminal, are oppressive, unjust, and incompatible with liberty, and therefore no ex post facto law shall be enacted."). The federal and North Carolina constitutional ex post facto provisions are analyzed "under the same definition." State v. Wiley, 355 N.C. 592, 625, 565 S.E.2d 22, 45 (2002), cert. denied, 537 U.S. 1117 (2003). Most pertinently here, the ex post facto prohibition applies to: "'Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.'" Id. (quoting Collins v. Youngblood, 497 U.S. 37, 42 (1990) (quoting Calder v. Bull, 3 U.S. 386, 390 (1798))).

---

[7]Jones, 364 N.C. at 257, 698 S.E.2d at 56 (emphasis added).

Legislation that retroactively alters sentence reduction credits in effect at the time a crime was committed can be an unconstitutional ex post facto law. See Weaver v. Graham, 450 U.S. 24, 25, 36 (1981) (finding an ex post facto violation in Florida legislation that altered the availability of good time sentence reduction from a convicted prisoner's sentence). However, Jones does not allege that any legislation or regulation has altered the award of sentence reduction credits. Nor has DOC changed its interpretation of its applicable regulations. Accordingly, . . . Jones has suffered no ex post facto violation.

Jones, 364 N.C. at 259, 698 S.E.2d at 57 (last alteration added); id. at 260–63, 698 S.E.2d at 58–60 (Newby, J., concurring).

As the North Carolina Supreme Court plurality noted, DOC's sentence reduction credit "regulations were promulgated by DOC years after Jones was sentenced." Jones, 364 N.C. at 258, 698 S.E.2d at 56. Moreover, as a factual matter, the North Carolina Supreme Court found that DOC never promulgated a regulation under state law shortening or modifying petitioners' sentences and never applied sentence reduction credits towards calculating the date of their unconditional release. Jones, 364 N.C. at 254, 258, 698 S.E.2d at 54, 57; id. at 261, 698 S.E.2d at 58 (Newby, J., concurring). Thus, DOC's decision to exclude petitioners from receiving sentence reduction credits for the same purposes as inmates who were not sentenced to life imprisonment during the relevant time period "had no effect on the punishment assigned by law when the act to be punished occurred." Gonzalez-Fuentes, 607 F.3d at 878; see Stiver v. Meko, 130 F.3d 574, 578 (3d Cir. 1997) (finding that because the enabling statute for a sentencing reduction was passed after the petitioner committed his offense, no ex post facto violation occurred when the Bureau of Prisons subsequently promulgated a regulation revoking the reduction); Foster v. Barbour, 613 F.2d 59, 61–62 (4th Cir. 1980) (finding that a North Carolina Supreme Court decision, which held that sentencing under the youthful offender statute was not available for conviction of first-degree murder, did not violate the ex post facto clause; "the possible punishments for first degree murder were certain prior to the

25

enactment of the youthful offenders statute, and . . . . [t]he North Carolina General Assembly has consistently mandated death or life imprisonment for first degree murder"); Walter v. Prudden, No. 4:10CV2191 JCH, 2011 WL 1979606, at *2 (E.D. Mo. May 20, 2011) (unpublished) (finding that a legislative amendment to statute which revoked a state inmate's eligibility for good time credits was not an ex post facto violation because "the consequences imposed on petitioner do not constitute additional punishment, as his actual sentence has not been enhanced" and "[t]here was nothing in the law that actually increased his sentence, as imposed by the sentencing court"); Rone v. Johnson, No. 1:08cv399 (CMH/JFA), 2009 WL 1076747, at *3 (E.D. Va. Apr. 21, 2009) (unpublished) (finding no ex post facto violation where parole board "simply declined to apply good time credit earned before [petitioner's] release on parole against his sentence" where the petitioner "has not [been] incarcerated . . . for longer than the full term of his original sentences"). Accordingly, petitioners have not shown that the North Carolina Supreme Court's holding in Jones was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or based on an unreasonable determination of the facts in light of the evidence presented in state court. See, e.g., Harrington, 131 S. Ct. at 786–87; DeCastro, 2011 WL 2164115, at *5.

In sum, petitioners have not shown that the North Carolina Supreme Court's application of the precedent of the Supreme Court of the United States "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786–87. Accordingly, the court grants summary judgment to respondents and dismisses petitioners' applications for writs of habeas corpus.

C.

Rule 11 of the Rules Governing Section 2254 Cases provides that "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Having determined petitioners are not entitled to relief and respondents are entitled to dismissal of the petitions, the court considers whether petitioners are nonetheless entitled to a certificate of appealability with respect to one or more of the issues presented in their habeas petitions.

A certificate of appealability may issue only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a petitioner's constitutional claims have been adjudicated and denied on the merits by the district court, the petitioner must demonstrate that reasonable jurists could debate whether the issue should have been decided differently or show that the issue is adequate to deserve encouragement to proceed further. Miller-El v. Cockrell, 537 U.S. 322, 336–38 (2003); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000).

After reviewing the claims presented in the habeas petitions in light of the applicable standard, the court finds reasonable jurists would not find the court's treatment of any of petitioners' claims debatable or wrong, and none of the issues are adequate to deserve encouragement to proceed further. Accordingly, the court denies certificates of appealability.

III.

In sum, the court GRANTS petitioners' motions to consolidate [Baggett, D.E. 14, 17; Powell, D.E. 15; Richardson, D.E. 15; Seaborn, D.E. 16], GRANTS the Baggett respondents' motion to deem their reply memorandum timely filed [Baggett, D.E. 24], GRANTS the Powell and Richardson respondents' motions to exceed page limit [Powell, D.E. 11; Richardson, D.E. 11], and GRANTS respondents' motions for summary judgment [Baggett, D.E. 9; Powell, D.E. 10; Richardson, D.E. 10; Seaborn, D.E. 10]. The court DISMISSES the applications for writs of habeas corpus [Baggett,

D.E. 1; <u>Powell</u>, D.E. 1; <u>Richardson</u>, D.E. 1; <u>Seaborn</u>, D.E. 1], DENIES petitioners' requests for evidentiary hearings, and DENIES certificates of appealability. <u>See</u> 28 U.S.C. § 2253(c). The Clerk of Court shall close these cases.

SO ORDERED. This _1_ day of July 2011.

JAMES C. DEVER III
United States District Judge